UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOHN CHRISTOPHER CLEMENTS,

    Plaintiff,

v.                                          CASE NO. 6:19-CV-1685-Orl-MAP

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

## **ORDER**

This is an appeal of the administrative denial of disability insurance benefits (DIB) and period of disability benefits.[1] *See* 42 U.S.C. § 405(g). Plaintiff argues the administrative law judge (ALJ) erred by assigning little weight to the opinions of his treating psychiatrist Morteza Nadjafi, M.D. After considering the parties' arguments and the administrative record, I find the Commissioner's decision is supported by substantial evidence. I affirm.

    A.    *Background*

Plaintiff John Clements was born on January 27, 1967, and was 51 years old on the date of his administrative hearing. (R. 26) He alleges he has suffered from disabling bipolar disorder since August 1, 2013. For treatment, Plaintiff testified he self-medicated with alcohol for years before starting mental health therapy in July 2015, when he felt he could no longer control his behavior. (R. 52-53) He was "extremely emotional. If, if someone, you know, did something that I felt was, was wrong to me, that's all I could fixate on. . . . I was afraid that it would get to the point where I was going to do something really bad." (*Id.*) He was worried he "was going to hurt somebody

---

[1] The parties have consented to my jurisdiction. *See* 28 U.S.C. § 636(c).

1

or hurt myself – be a statistic." (*Id.*)  Plaintiff's wife, after "watching me destroy my family," convinced him to seek help. (*Id.*)

Plaintiff left high school in the tenth grade and earned his GED.  After that he worked as a health club manager, a car salesman, and a health equipment salesman.  He quit to start his own business designing and manufacturing after-market Jeep parts in 2014. (R. 26)  He reasoned that his constant problems with authority meant he was better off as his own boss.  He tried on and off for two years to keep his auto parts business afloat before it finally went under; Plaintiff declared bankruptcy in 2016. (R. 54)  Plaintiff lives with his wife (a pharmacist) and two young children, whom he watches over the summer while his wife works.

After a hearing, the ALJ found that Plaintiff had not performed substantial gainful activity between August 1, 2013 (his alleged onset date), and September 30, 2016 (his date last insured for DIB purposes), despite his work building his auto parts business. (R. 21)  The ALJ identified Plaintiff's bipolar disorder as a severe impairment but found Plaintiff not disabled because he maintains the residual functional capacity (RFC) for a full range of work at all exertional levels, with some limitations (R. 23)  Specifically,

> Through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: no climbing ladders, ropes and scaffolds and no exposure to obvious hazards.  The claimant could also: understand, carry out and remember simple instructions where the work is no fast paced, meaning no work where the pace of productivity is dictated by an external source over which the claimant has no control such as an assembly line or conveyor belt; make judgments on simple work, and respond appropriately to usual work situations and changes in a routine work setting that is repetitive from day to day with few and expected changes; and respond appropriately to supervision but not with the general public, and occasional contact with coworkers where there is no working in team or tandem with coworkers.

(R. 23)  In an August 2, 2018, decision, the ALJ found that, with this RFC, Plaintiff could not perform his past work but could work as a laundry laborer, floor waxer, and meat trimmer. (R. 26)

Plaintiff appealed the ALJ's decision to the Appeals Council (AC), which denied review. (R. 2) Plaintiff, his administrative remedies exhausted, filed this action.

### B. *Standard of Review*

To be entitled to DIB, a claimant must be unable to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A). A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *See* 42 U.S.C. § 423(d)(3).

The Social Security Administration, to regularize the adjudicative process, promulgated detailed regulations. These regulations establish a "sequential evaluation process" to determine if a claimant is disabled. *See* 20 C.F.R. § 404.1520. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a)(4). Under this process, the Commissioner must determine, in sequence, the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment(s) (*i.e.*, one that significantly limits his ability to perform work-related functions); (3) whether the severe impairment meets or equals the medical criteria of Appendix 1, 20 C.F.R. Part 404, Subpart P; (4) considering the Commissioner's determination of claimant's RFC, whether the claimant can perform his past relevant work; and (5) if the claimant cannot perform the tasks required of his prior work, the ALJ must decide if the claimant can do other work in the national economy in view of his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4).

A claimant is entitled to benefits only if unable to perform other work. *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 404.1520(f), (g).

In reviewing the ALJ's findings, this Court must ask if substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The ALJ's factual findings are conclusive if "substantial evidence consisting of relevant evidence as a reasonable person would accept as adequate to support a conclusion exists." *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citation and quotations omitted). The Court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Keeton*, 21 F.3d at 1066 (citations omitted).

    C.    *Discussion*

        1.    *Plaintiff's treating psychiatrist, Dr. Nadjafi*

Plaintiff advances one argument: the ALJ erred by discounting the mental RFC assessment of his treating psychiatrist of two years, Dr. Nadjafi, who opined in November 2017, that Plaintiff's bipolar disorder seriously impairs his interpersonal skills and social relationships and that Plaintiff is seriously limited in his ability to maintain attention and regular attendance, get along with co-workers, complete a normal workday, respond to criticism, and cope with stress. (Doc. 28 at 12; R. 335-38) The Commissioner responds that the ALJ properly discounted Dr. Nadjafi's mental RFC assessment as inconsistent with the psychiatrist's own treatment notes and with the findings of Jeff Oatley, Ph.D., who examined Plaintiff once and completed a psychological evaluation in October 2016, and non-examining state agency consultants Nancy Dinwoodie, M.D. and Adrine

McKenzie, M.D., who completed mental RFC assessments at the initial and reconsideration levels, respectively (Doc. 32; R. 77-92). I agree with the Commissioner.

The method for weighing medical opinions under the Social Security Act is in the regulations at 20 C.F.R. § 404.1527(c).[2] Relevant here, the opinions of examining physicians are generally given more weight than non-examining physicians, treating more than non-treating physicians, and specialists more than non-specialist physicians. 20 C.F.R. § 404.1527(c)(1-5). A court must give a treating physician's opinions substantial or considerable weight unless "good cause" is shown to the contrary. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause for disregarding such opinions "exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citation omitted).

This rule – the "treating physician rule" – reflects the regulations, which recognize that treating physicians "are likely to be the medical professionals most likely to provide a detailed, longitudinal picture of . . . medical impairment." 20 C.F.R. § 404.1527(c)(2). With good cause, an ALJ may disregard a treating physician's opinion but "must clearly articulate the reasons for doing so." *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (*quoting Phillips v. Barnhart*, 357 at 1240 n.8). And the ALJ must state the weight given to different medical opinions and why. *Id*. Otherwise, "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

---

[2] This section was rescinded on March 27, 2017, but still applies to claims filed before this date. Plaintiff filed his claim on December 8, 2015 (Tr. 19).

The ALJ had good cause to discount Dr. Nadjafi's opinion. Plaintiff's first appointment with Dr. Nadjafi was on July 21, 2015 (two years after his alleged onset date). (R. 294) He described feelings of worthlessness and isolation. He was easily agitated. His said his mood would swing throughout the day from euphoric to depressed and back again. (R. 295) He had delusions of grandeur followed by suicidal thoughts. He reported being sober for the previous three years and said he had not had any mental health treatment as an adult. (R. 297) Dr. Nadjafi diagnosed Plaintiff with bipolar disorder and prescribed Wellbutrin, Clonazepam, and Depakote. The psychiatrist's treatment plan included medication and cognitive behavioral therapy. The next month, Plaintiff reported he was doing well on his medications and his moods were more stable. (R. 292)

But at his third appointment on August 28, 2015, Plaintiff felt worse: he was manic, agitated, and angry. (R. 290) It was hard for him to communicate. The doctor noted Plaintiff was addicted to his phone and depressed. (*Id*.) Nonetheless, Dr. Nadjafi checked boxes indicating Plaintiff's behavior and affect were appropriate, his thought process was goal-directed, his speech was normal, and his attitude was cooperative. Overall, his prognosis was "fair." (*Id*.) The doctor did not make changes to Plaintiff's treatment regimen. A month later, on September 29, 2015, Plaintiff said, "I feel pretty good. Not getting easily agitated." (R. 289) He told Dr. Nadjafi that when he does get agitated during the day, he takes a Clonazepam. Dr. Nadjafi asked Plaintiff to return for a follow-up in three months, and that remained the pattern of Plaintiff's appointments for the duration of their treating relationship.

In December 2015, Dr. Nadjafi noted Plaintiff was "now fairly stable." (R. 286) Plaintiff's failing Jeep parts business was a strain on him, and he felt his mental disorder was a reason for its failure. Dr. Nadjafi continued to prescribe cognitive behavioral therapy and added Lorazepam to

6

Plaintiff's medications. At Plaintiff's March 2016 appointment, he reported, "overall doing well, not much ups and downs." (R. 352) He had lost his health insurance and was filing for bankruptcy. Dr. Nadjafi assessed "partial improvement" and a "fair prognosis" if Plaintiff complied with his treatment plan. (R. 353) In June 2016, Plaintiff had insomnia and anxiety. It appears Dr. Nadjafi took him off Wellbutrin and prescribed Seroquel. (R. 354) In September 2016, Plaintiff reported feeling angry and hopeless yet, strangely, he said "work is busy." (R. 356) Dr. Nadjafi added Wellbutrin back to Plaintiff's list of medications.

Three months later, in September 2016 (Plaintiff's DLI), Plaintiff was "a little more active, last 3 weeks was more moody, and depressed, but is doing better." (R. 358) He was preoccupied with past mistakes. Plaintiff's work was "still not good," and he regretted leaving his last job. (*Id.*) And by March 2017, he was depressed after what he said was a period of mania. (R. 360) At Plaintiff's June 2017 appointment, he had rebounded again: he was "doing real well, has lost 35 lbs., I have a lot of energy, good motivation, working better in business." (R. 362) Although Plaintiff appeared happy to Dr. Nadjafi, he reported deep regret over past decisions that prevented him from being happy. He admitted he was no longer taking Seroquel. (R. 363) Then, at his September 2017 appointment, he was "doing a lot better" and had lost weight. (R. 364) A hurricane had displaced Plaintiff and his family, and he was working hard on his new home. He was hopeful he could sell his business.

This treatment history informed Dr. Nadjafi's November 8, 2017, mental RFC assessment of Plaintiff. (R. 334-38) After acknowledging Plaintiff's diagnoses of bipolar disorder and obsessive-compulsive personality disorder, he observed "treatment response has not been adequate. Patient has residual symptoms." (R. 334) Plaintiff experienced sedation and lack of energy. He had a "depressed mood, easily angered, anxiety, obsessive preoccupation, episodes of

hypomania resulting [in] poor decisions." (*Id*.)  His prognosis was "guarded." (*Id*.)  He had zero ability to deal with stress, serious limitations in his ability to maintain attention and attendance, work in coordination or proximity with others, and complete a normal workday without interruption from his psychological symptoms. (R. 336) Dr. Nadjafi opined Plaintiff could not get along with coworkers, accept instructions, and adapt to routine changes in the workplace; he could not hold a job. (*Id*.)  At first, the psychiatrist wrote that Plaintiff had toiled under this mental RFC since the beginning of 2017 (after his DLI) (R. 338), but he later clarified his RFC assessment dated back to 2015. (R. 407)

The ALJ assigned Dr. Nadjafi's opinion little weight because it addressed an issue ultimately reserved for the ALJ (Plaintiff's ability to hold a job) and was inconsistent with the psychiatrist's own treatment notes, which showed "improvement with medication management." (R. 25)  Substantial evidence supports this.  Dr. Nadjafi's treatment notes track Plaintiff's highs and lows, typical of a bipolar sufferer.  At Plaintiff's hearing, he described his bipolar experience as "the most extreme roller coaster that you can imagine and being on it, but it never stops, and, and you can never get off.  There's no peace. . . I'm tired of fighting." (R. 58)  But throughout Plaintiff's treatment (and especially through his DLI), Dr. Nadjafi opined Plaintiff's prognosis was fair, his medications were working, and there were not as may ups and downs – his moods were stabilizing.

Dr. Oatley's October 2016 consultative psychological evaluation of Plaintiff offers additional support for the ALJ's decision to discount Dr. Nadjafi's mental RFC assessment.  Dr. Oatley observed Plaintiff on the verge of tears as he described racing thoughts, insomnia, regret over past decisions, and constant worry about being a good dad.  Plaintiff admitted he had contemplated suicide but never followed through because of his kids. (R. 309) Plaintiff relayed

8

that earlier in the progression of his disease his manic episodes were productive for his career but that his most recent one (a year earlier) resulted in him getting fired. According to Plaintiff, since starting treatment with Dr. Nadjafi, "he believes the medications are reducing the frequency of mania." (*Id*.) This is consistent with Plaintiff's statement to Dr. Nadjafi in December 2016, that he was depressed but feeling better. (R. 358) Dr. Oatley observed Plaintiff's fund of knowledge, short- and long-term memory, and thought processes appeared intact. (R. 309) And, Plaintiff said he drives, shops, takes care of his kids while his wife works, and does household chores (albeit hastily before his wife comes home). Dr. Oatley diagnosed Plaintiff with mild bipolar I disorder and opined Plaintiff's prognosis was fair if he continued treatment. (R. 310) The ALJ summarized Dr. Oatley's findings in formulating Plaintiff's RFC. (R. 25)

Also, in September 2016 (Plaintiff's DLI), general practitioner Brittany Newton, M.D. evaluated Plaintiff at the agency's request. (R. 315) Regarding his mental state, Plaintiff was tearful and depressed, yet he stated his medications afford him "pretty good" control over his moods as long as there are no triggers. (*Id*.) Also supporting the ALJ's decision to discount Dr. Nadjafi's opinion are the findings of state agency non-examiners, Drs. Dinwoodie and McKenzie, who completed separate mental RFC assessments at the initial and reconsideration levels. Dr. Dinwoodie opined in April 2016, that Plaintiff could maintain concentration, persistence and pace for up to two hours at a time, interact with coworkers, make simple work-related decisions, adapt to workplace changes, and complete a normal workday. (R. 79) In October 2016, at the reconsideration level, Dr. McKenzie opined that Plaintiff was fairly stable on medication. (R. 92) He had some problems with concentration and moderate problems with socialization, according to Dr. McKenzie. (*Id*.) Consequently, the ALJ determined Plaintiff suffered from more severe social limitations than those assessed by Dr. Dinwoodie and assigned these opinions "some weight." (R.

25) *See Forsyth v. Comm'r of Soc. Sec.*, 503 F. App'x 892, 893 (11th Cir. 2013) (it is not error for ALJ to rely on statements from non-examining physicians if ALJ articulates good cause to discount treating physician's opinion).

Overall, the ALJ's decision to discount Dr. Nadjafi's mental RFC assessment is supported by substantial evidence, namely Dr. Nadjafi's treatment notes (which tracked Plaintiff's incremental yet steady improvement with treatment), Dr. Oatley's consultative examination (a month after Plaintiff's DLI; it was consistent with Dr. Nadjafi's treatment notes), Dr. Newton's observation that Plaintiff's medications helped him control his moods, and to some extent Drs. Dinwoodie and McKenzie's mental RFC findings that Plaintiff was stable on medication. Additionally, the ALJ's task of formulating a claimant's RFC is a legal, not a medical, one; the ALJ was not duty-bound to accept Dr. Nadjafi's RFC assessment so long as the ALJ supports her findings with substantial evidence. *See* 20 C.F.R. § 404.1546(c). Here, for the reasons stated above, she has done so. The ALJ did not err in her consideration of Dr. Nadjafi's opinions.

At this point, I reiterate that, when reviewing an ALJ's decision, my job is to determine whether the administrative record contains enough evidence to support the ALJ's factual findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, ___ U.S. ___; 139 S.Ct. 1148, 1154 (2019). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* In other words, I am not permitted to reweigh the evidence or substitute my own judgment for that of the ALJ even if I find the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

*D. Conclusion*

For the reasons stated above, it is ORDERED:

(1) The ALJ's decision is AFFIRMED; and

10

(2) The Clerk of Court is directed to enter judgment for Defendant and close the case.

DONE and ORDERED in Tampa, Florida on August 25, 2020.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE